IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

PAUL MINIX                                 §

                                           §        CIVIL ACTION NO. 6:06cv306

DENNIS BLEVINS, ET AL.                     §

### MEMORANDUM OPINION AND PARTIAL ORDER OF DISMISSAL

The Plaintiff Paul Minix, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights.   The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. 636(c).

An evidentiary hearing was conducted on January 30, 2007, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).  At this hearing and in his complaint, Minix testified that he arrived at the Powledge Unit on December 5, 2005.  He had two bags of property, and Lee Ann Spears, the law librarian, told him to submit a request for an extra property storage box.

The next day, Minix said, he went before the Unit Classification Committee.  Major Barbosa told him that he, Barbosa, had received a phone call from the last unit where Minix had been housed, saying that Minix was a "litigator and complainer."  Barbosa said that if Minix filed anything, he would be in trouble.  Minix said that if he had any complaints, he would bring them to Barbosa first.

By December 17, Minix stated that he had filed four requests for an extra property storage box, but to no avail.  He complained to Major Barbosa, who set up a meeting with himself, Minix, and Spears.  At this meeting, Spears said that Minix was not following the rules, but would

not say what rules.  Barbosa threatened Minix, and Minix complained to Warden Blevins, who said that he would "look into it."

On January 5, 2006, Spears came to inspect his cell, but Minix says that she "just wanted to argue."  He ordered her out of his cell, and she wrote him a disciplinary case.  Minix says that the case was investigated by a sergeant, who "threw it out."

Spears wanted Lt. Huddleston, the unit property officer, to confiscate Minix's property, but Huddleston said that he did not want to get involved.  Minix complained to his family, and they began contacting unit officials.

On February 10, 2006, Minix says, Barbosa came to his cell and said that Minix had 30 minutes to pack up his legal property which would not fit in his locker, and he would be back to get it.  Minix refused this order.  Barbosa came back in 30 minutes with Lt. Stanhope, but Minix still refused.  15 minutes later, Barbosa returned and threatened to use chemical agents against Minix, but Minix said that he was a heart patient.  There was a camera operator present, but the camera had the lens cap on.

About 20 minutes later, Barbosa and Stanhope returned to the cell.  Stanhope asked if Minix was going to come out of the cell, and Minix said that he was not refusing to come out, he was refusing to turn over his legal property.  This exchange was repeated three times, and then chemical agents were used on Minix.  Nurse Kelly Maxwell was overseeing the incident, and gave approval for the use of gas.  Afterwards, Minix was decontaminated, and Maxwell took his vital signs.  Minix says that he was told he would be fine, but a few hours later, he had to go to the infirmary for chest pains.

All of his legal property was taken away.  Minix says that Spears went through it and set all of his pending litigation aside, but returned to him materials which were irrelevant.  Minix received a disciplinary case for refusing an order, and Captain Atwood found him guilty.  When Minix asked why, Atwood said that he "had a job to do."

Later, Minix says, he received a visit from the Office of the Inspector General regarding the complaints which his family had made.  He says that the OIG inspector told him that the use of force was unjustified and that they were looking to take action against Barbosa.  The next day, Barbosa came to see him and made snide remarks about "how was his heart."  Minix states that Barbosa was later transferred to the Coffield Unit.

Minix states that Charlotte Odom was the grievance investigator.  She saw Minix's property and knew that Spears was violating policy, but did nothing.  Odom also refused to process a grievance which Minix had filed regarding threats from Barbosa, so he went to see Blevins.  The warden ordered a life endangerment investigation, but the investigation was done by Stanhope, who "covered it up."  Minix says that Spears denied him legal supplies for 70 days, and would not send out his mail.

On March 31, 2006, Minix says that the unit went on lockdown.  Cell searches were being done, and his cell was "trashed."  He says that Spears and Officer Fannett came to his cell, took his legal envelopes, and dumped their contents on the floor before confiscating the envelopes. He asked Fannett why Spears had done this, and Fannett said that Spears could not find anything else to take.

Meanwhile, Minix says, the disciplinary case which he had received was overturned, so another hearing was held.  At this hearing, Stanhope said that Barbosa had told him, Stanhope, that they were going to take Minix's property.

Lt. Huddleston had stated that he did not want to get involved, but then refused to return all of Minix's property once it was confiscated.  Huddleston did bring some of Minix's property, though, including portions of each pending case.  Minix told Huddleston that over 100 family photographs were missing, but Huddleston told him that he did not find any photographs.

The above is the chronology of Minix's complaint.  He organized his complaint and amended complaint by defendant, so the Court will follow this organization and discuss Minix's claims against each of the defendants individually.

I. Warden Blevins

Minix states that on December 28, 2005, he talked to Blevins about a complaint which he had filed regarding threats from Major Barbosa. Blevins ordered Atwood to investigate the threats and initiate a life endangerment investigation. Minix also complained to Blevins that Spears was refusing him additional storage for his legal property, and Blevins promised to investigate this as well. However, neither of these problems were corrected.

Second, Minix says that on February 10, 2006, Blevins allowed Barbosa to carry out his threat by having Stanhope use chemical agents on Minix, even after Minix said that he was a heart patient. He says that Blevins "signed off" on the assault, a reduction in Minix's level status, and the confiscation of his legal and religious property, but he was never given a hearing for the confiscation of this property, nor the imposition of disciplinary restrictions. He says that he was punished for nothing more than "being a litigator within the prison."

Third, Minix says that on February 28, 2006, he gave a Supreme Court document to the unit grievance coordinator, Charlotte Odom, to give to Blevins to show how urgently he needed the Supreme Court records which had been confiscated on February 10, but Blevins ignored it, causing him to lose his criminal appeal.

Finally, Minix says that "additional claims will be presented to the courts," apparently involving Blevins' denials of his grievances, but he does not indicate what these might be.

II. Warden Hodge

Minix says that on March 22, 2006, Hodge talked to him in person about a letter which Minix had written concerning Spears' refusal to send his mail and her refusal to return his property. Hodge gave Minix back his mail and told him that he would talk to Spears and see why she would not send out his mail, but that he "did not want to get involved" with the confiscation of his legal property. Hodge sent Spears and Huddleston to Minix's cell to get a list of the material he needed for his civil and criminal litigation, which Minix provided, but the officers brought him

nothing.  Minix says that he wrote to Hodge on several occasions, but that Hodge took no action, thus "condoning the retaliation."

### III. Major Barbosa

On December 6, 2006, Minix says that at the Unit Classification Committee hearing when he first arrived at the Powledge Unit, Barbosa said told him that if he, Minix, began filing complaints, he would not like his stay at the Powledge Unit, and that he, Barbosa, would make things very difficult for him.  Barbosa said that it would be in Minix's best interests not to start filing any complaints, and that there was another inmate in administrative segregation who might start asking for help, but that Minix "would be very wise" not to get involved.  Barbosa noted that Minix was closer to his family at the Powledge Unit and that he, Barbosa, would approve contact visits between Minix and his family, but that if Minix started filing or causing problems, then Barbosa would not allow such visits. Minix replied that if he had any problems, he would bring them to Barbosa to resolve, and Barbosa agreed.

On December 20, Barbosa called Minix to his office in response to letters which he had sent complaining that Spears was refusing to provide him with additional storage space, denying him indigent supplies, and returning his legal and personal mail.  However, he says, Barbosa "sided with Spears' misconduct and condoned the harassment."  As Minix left the office, he says, Barbosa again reminded him that if he began filing, he "would not like the consequences."  Minix reported the threats to Blevins, who ordered a life endangerment investigation.

Minix says that he continued to file complaints, and his family began doing so as well.  On February 10, 2006, Barbosa came to his cell with Lt. Stanhope and banged on the door, waking him up.  Barbosa said that Minix had 30 minutes to gather up all of his legal property which would not fit in his locker, and he would be back to get it.  Minix replied that he was not going to give Barbosa any pending civil or criminal litigation.  Barbosa returned to the cell two more times to threaten Minix with the use of chemical agents, even though Minix said that he was a heart patient.  Barbosa then had Stanhope use the gas on him so as to take his legal property.

5

On March 1, 2006, Barbosa again came to Minix's cell and woke him up to threaten him and taunt him.  Minix reported the threat to Warden Blevins, who ordered another life endangerment investigation.

Minix also says that Barbosa is involved in a number of conspiracies against him, including conspiring with Spears to deny him storage and deprive him of his property for being a litigator, conspiring with Stanhope to use chemical agents against him, and conspiring with nurse manager Kelly Maxwell and Warden Blevins to get authorization to gas him.

IV. Lee Ann Spears, Law Library Supervisor

Minix says that Spears is responsible for every harmful and wrongful act that he has endured since arriving at the Powledge Unit. He says that when he arrived at the Powledge Unit, he had two bags of property, one personal and one legal, and he already been approved for additional storage space for his property.  Spears was present in the segregation area and saw how much property he had, and knew that there was not room for storage in a cell that had only one locker box which measured 1.75 cubic feet.

On December 8, Minix completed a form requesting additional storage and submitted it to Spears.  By TDCJ rules, Minix says, Spears had one week to verify the information and review his property so that an additional storage container could be provided, but this was never done.  On December 13, he asked Spears why she had not processed his request, and she replied that "you might not get it."  That same day, Minix requested legal and educational storage request forms, because he had other property which would be arriving soon, but Spears denied these requests and said that his request for additional storage space had been filled out incorrectly, which was not true. Minix then filed a grievance, and Spears sent him some of the forms which he had requested.  He filled these out, but Spears ignored them.  On December 16, Spears returned his outgoing legal mail to him, apparently in retaliation for the grievance.

Around December 17, Minix's additional property, comprising four bags in all, began to arrive. This included three bags of legal materials as well as Bible school correspondence courses.

Spears saw all of this property, but did not take action to ensure that Minix had adequate storage space.

On December 20, Minix says, Major Barbosa called him to his office because of complaints which Minix had filed about being denied legal storage.  Spears was also present. However, Minix says, the storage complaint was never addressed.  He filed more complaints against Spears, and finally got copies of storage space request forms.

After he turned in these forms, Spears came to inspect his property on January 6, but brought no storage containers.  During this review, Spears mis-stated TDCJ policy in a way which was so erroneous that it made no sense.  He says that all Spears wanted to do was argue; she told him that he could not have any legal material in his in-cell locker box which was available in the law library, and that he could only have 50 business envelopes in his in-cell locker box.  When he tried to show her the instructions on the form, she did not want to hear it, but only wanted to argue.  He then told Spears to get out of his cell and come back when she was ready to follow TDCJ rules.

Later that same day, Minix says, he was served with a disciplinary case, but it was thrown out by a supervisor because "it was obviously frivolous."  He says that all of the staff knew that he had been trying to get additional storage space from the beginning. Because this case was thrown out, Spears tried to get Huddleston to confiscate Minix's legal property, but Huddleston refused to get involved.

Third, Minix says that after he filed numerous grievances and complaints against Spears, she began retaliating against him by denying him indigent supplies and refusing to send out all of his mail.  As soon as his family began filing complaints, Spears and Barbosa began conspiring to deprive him of his legal property.  Shortly after the February 10 assault, Minix says that Spears searched, read, and purposely withheld from him his pending litigation in his criminal trial, his Galveston civil rights lawsuit, his "attorney record" of another pending civil rights parole case, a state board medical complaint against prison medical staff, part of a civil rights case involving a

property claim, six law books, and almost a thousand pages of hand written legal notes and research regarding his state conviction on appeal.  In addition, all of his religious property was confiscated.

For injury in these claims, Minix says first that Spears withheld his pending criminal appeal records that were being reviewed in the Supreme Court, thus causing "complete disruption" of his appeal.  He says that Spears continues to hold his law books and his thousand pages of "work product."

In his second injury claim, Minix says that Spears kept pending records in cause no. G-03-115, a civil rights lawsuit pending in Galveston.  He acknowledges that these records were returned in March of 2006, but says that the records were "all mixed up" and that "numerous court records and witness statements were missing."

Third, Minix says that Spears kept a whole "attorney record" of an attorney named Normal Sirak, who has filed a class action lawsuit in Austin against the Texas Parole Board, in cause no. A-05-CA-100955.  He says that he cannot become part of this litigation until the records are returned.

Fourth, Minix says that Spears kept essential records which he needs to complete a civil rights lawsuit against another facility which will be filed in the Southern District of Texas, and as long as this property is being withheld, he cannot file the lawsuit.  Minix does not indicate what this case is about, nor the nature of the property being withheld which is preventing him from filing his lawsuit.

In his fifth injury claim, Minix says that some of the legal documents withheld by Spears included the criminal records of an inmate named Harvey Mays, whom Minix was assisting in challenging his criminal conviction.  He says that Spears was causing "continuing legal injury" to Mays.

In his final claim on injury from Spears' actions, Minix says that on February 10, 2006, Spears deprived him of all of his Bible college correspondence courses, thereby depriving him of his right to exercise and practice his faith.

8

Minix goes on to assert that after filing multiple complaint forms, he received more forms requesting legal storage space, and turned them in on March 2, 2006, sending copies to Blevins and Hodge.  However, he received no response.  On April 19 and 20, 2006, he requested additional copies of the forms.  Spears responded, saying that she has a record of the forms that Minix had submitted, but she took no action to follow the time limitations for processing these forms.

On May 1, 2006, Major Dewberry, the new major at the Powledge Unit (after Barbosa went to Coffield) responded to Minix's request for an investigation.  He says that Dewberry conducted a more complete investigation than anyone had done thus far.  During a meeting, he states that Spears "was caught lying, misstating policy, and trying to make excuses," and so Dewberry told Minix to sign the forms and send it to him, and he would make sure that Spears processed it properly.  The next day, Spears sent him another copy of the form, and Minix signed it and sent it to Dewberry.

Minix next lists a number of instances of alleged retaliation and harassment by Spears.  On December 16, 2006, he says, Spears returned his outgoing mail because he filed a grievance against her.  This also happened on December 23, December 30, and January 13.  On January 25, Spears refused to issue him a pen.  On February 1, Spears refused to issue indigent supplies.  On February 10, he sent outgoing mail, but later learned that Spears was holding it.  On February 22, he says that Spears "admitted" that she was refusing him indigent supplies.  On March 1 and March 3, Spears returned his outgoing mail.  On March 15 and March 17, Spears denied him indigent supplies and returned his outgoing mail.

On March 29, 2006, Spears refused to return his indigent supply envelope, and he was not allowed to send out his legal mail.  On March 31, Spears came to his cell and searched it, and when she could not find any contraband, she emptied hundreds of grievance envelopes out of brown writ envelopes onto the floor and took the envelopes.  No other inmates were treated in this manner, and Spears did not go into anyone else's cell.

On April 5 and 12, 2006, Spears returned his outgoing mail to punish him for filing grievances.  On April 19, Minix sent in five used carbon sheets and an empty pen to exchange for new ones, but Spears kept them.  On April 21, Spears was delivering law books in segregation, and Minix asked if he was going to get new supplies.  Spears replied that Minix was lucky that he got any mail out, and that he was not going to get any new supplies.  She then said that she saw that Minix had received back his Level I status (the highest classification status in administrative segregation) and that she would see what she could do about that.  He filed a grievance, and later that day, Spears returned the carbon paper, but kept the pen.  Minix says that beginning in April of 2006, he began filing up to six grievances a week because he is being denied indigent supplies; he says that Spears thinks that if she disrupts his legal work, he will not be able to file this lawsuit.

V. Ronnie Stanhope

Minix sues Lt. Ronnie Stanhope, saying that on February 10, 2006, Stanhope came into the segregation area with Major Barbosa.  Minix and Barbosa exchanged words about Minix's legal property.  Around 10:30 a.m., Barbosa and Stanhope returned; Barbosa stayed behind the outer door while Stanhope came to the door of the cell with a camera operator.  Minix explained that he was a heart patient and should not be gassed; he also told the officers that he was not refusing to come out of his cell, but was only refusing to give up his criminal appeal property.  Stanhope looked over at Barbosa, who nodded.  Stanhope then mumbled something to the camera, raised a can of gas, and sprayed Minix in the face.  Minix says that he was in his cell, posing no threat to anyone.

About three to five minutes later, he says, he was overcome by the chemical agents and began to suffer severe chest pain.  He was unable to breathe or see, and asked that his cell door be opened.  He caught a glimpse of Barbosa laughing.  Finally, Stanhope told Minix to strip, which was almost impossible because he could not breathe.  He did strip and Stanhope applied hand restraints and took him to the shower.  While he was in the shower, another officer asked how much gas Stanhope had used, and Stanhope replied "most of it," while laughing.

Second, Minix says that on March 3, 2006, Blevins designated Stanhope to conduct a life endangerment investigation against Barbosa.  However, Stanhope covered it up and refused to complete the paperwork, also refusing to report Barbosa's threats to the Office of the Inspector General.

Next, Minix says that on May 4, 2006, his disciplinary case which he had received from Barbosa had been overturned, because TDCJ did not want Barbosa's name on it; Minix contends that Barbosa was reprimanded for the use of force in the application of the chemical agents. Instead, Stanhope re-wrote the same case as charging officer.  During the hearing on the disciplinary case, Stanhope admitted that he had met with Barbosa prior to the use of force, which Minix says is proof of a conspiracy.

## VI. Delton Atwood

The sixth named defendant is Delton Atwood, a captain at the Powledge Unit.  He says that Atwood knew that the disciplinary case against him was filed in retaliation, but found him guilty anyway.  Minix states that on December 28, 2005, Atwood conducted a life endangerment investigation which had been ordered by Warden Blevins because of grievances filed by Minix against Barbosa.  However, he says, Atwood "covered up" for Barbosa and "refused to complete the proper paperwork."

On February 15, 2005, Minix says that Atwood presided over the disciplinary hearing for the case written by Barbosa, when Stanhope had used chemical agents against Minix.  Atwood found him guilty and imposed punishments of 30 days of commissary restrictions, 15 days of recreation restriction, and reduction in classification status from State Approved Trusty III to Line Class I.  He says that not only was the use of force unnecessary and unjustified, but Atwood knew that Barbosa had made threats against Minix two months earlier.  He says that Atwood punished him "for Barbosa" and thus condoned the retaliatory assault.  During the hearing, at the end, Minix says that he asked Atwood why he had been found guilty when Atwood knew of the threats by Barbosa, and Atwood replied that he had a job to do and that it did not matter what his co-worker had done.

11

Next, Minix says, on March 22, 2006, he talked to Warden Hodge about Spears refusing to send his outgoing legal mail and the confiscation of his legal property. Atwood was present and "clearly condoned" Spears' retaliation and violations of policy regarding his indigent supplies. He says that Atwood stated that he was aware of what was going on but that Spears was assigned to that department and that he, Atwood, would not get involved in her field of work.

Fourth, Minix says that on May 5, 2006, he told Atwood that Spears was refusing to issue him writing supplies, thus forcing Minix to obtain these supplies from other inmates, or to write letters on grievance forms or the backs of legal forms. Atwood said that he would talk to Spears about it, but did nothing. He also complained to Atwood about Spears trashing his cell, and Atwood said that he knew about that incident and that Spears "had given some reason for it."

Fifth, Minix says that on May 11, 2006, Atwood presided over another disciplinary case, which was the re-hearing of the February 15 case originally written by Barbosa, The later case had been written by Stanhope. Atwood found him guilty again and gave him the same punishment, even though Stanhope testified that he had conspired with Barbosa to use the chemical agents.

VII. Kelly Maxwell

The seventh defendant named is Kelly Maxwell, whom Minix says was "assistant nurse manager" at the Powledge Unit. Minix says that the second day that he arrived at the Powledge Unit, the medical staff began refusing to bring him his stomach medication three times a day, which he had been on for over two years. On December 9, he filed a grievance complaining about this. On December 14, the medical department retaliated against him by reducing the dosage to twice a day. On January 6, the grievance was returned, saying that Minix would get his medication three times a day, but it remained at only twice a day. Minix says that this proves that "someone in the medical department" over-rode the grievance decision and retaliated against him for filing it.

On January 9, 2006, Minix says, his family filed a complaint against the medical department for retaliating against him.  The prison health services in Huntsville took no action to resolve the issue.  Minix does not say how Maxwell was involved in this claim.

From December of 2005 until February of 2006, Minix says that Maxwell answered and responded to numerous complaints which he filed, but condoned the retaliation by failing to address the issues.  On February 10, 2006, Maxwell gave Barbosa authorization to use chemical agents, although there was no need for such abuse.  He says that Maxwell knew that he was a heart patient but still approved the use of the gas, knowing that it could cause severe problems or death.  About 20 minutes after the assault, Minix says, Maxwell called him out of his cell to the segregation desk.  There, Maxwell and another nurse checked his blood pressure and heart rate.  The nurse said that Minix's clood pressure was 168 / 112 and that his heart rate was 147, and asked if he were feeling all right.  Minix replied that he was having chest pain, his skin was burning, and was having a hard time breathing because his heart would not slow down.  He wanted to see the doctor, and the nurse said that he should, but Maxwell said that he would be fine and that he did not need to go to the infirmary.  Maxwell and the nurse then left, and Minix was put back in his cell, which was still soaked with the gas to the point that the walls were orange.

Later that same day, Minix says, his chest pain was so bad that he had to be taken to the infirmary and given an EKG exam.  This test revealed a condition called sinus tachycardia, which Minix says means an extensively elevated heart rate.  The nurse said that Minix should have been brought down right after the gas was used on him, and that gas should not have been used on him because of his cardiac history.  The nurse made a phone call to see what to do, and returned to tell him that he was being sent back to his cell and a doctor's appointment would be scheduled.  However, Minix says, he has never seen the doctor.

On March 15, 2006, he asked to review his medical records, and discovered that the heart rate and blood pressure had been falsified by Maxwell.  He says that this was done to make it

look like he was having no adverse health effects, but the EKG test a few hours later shows that Maxwell is a "malicious liar."

Minix says that he suffered risk of death, burning of his face, eyes, arms, and legs for several days, and "spontaneous chest pain" that would strike night and day, and wake him from sleep. He says that his chest pain was so frequent that he used a whole bottle of 25 nitroglycerin tablets during the first week after the assault, and another bottle and a half over the next month. He says that his heart would flutter, skip beats, and shoot intense pain into his left arm every time he tried to exercise, all of which caused emotional distress and mental anguish. He says that he was afraid that he was going to have a heart attack due to the lasting effects of the chemical agents. He also suffered severe headaches and twitching of his left eye for three to four weeks afterward.

### VIII. Charlotte Odom

Minix next sues Charlotte Odom, the grievance coordinator at the Powledge Unit. He says that Odom had the authority, duty, and obligation to correct, report, and enforce prison policies when his rights were being violated. However, she condoned and participated in the retaliation and even conspired to cover it up; she also told Minix and others that she did whatever unit officials told her to do. Minix lists several instances in which he filed grievances regarding his mail, legal materials, or other matters, and Odom did nothing.

### IX. Alynda Gatson

Minix says that on March 31, 2006, Gatson was the supervisor in charge while staff officials conducted cell searches in the administrative segregation area. He was the second person to be pulled out of his cell. When Minix was taken out of his cell, he was put in the shower by Gatson. As soon as he was in there, Gatson picked up the phone and made a call. A couple of minutes later, the door to the segregation area buzzed and Officer Fannett let someone in. Fannett then went to the desk and got another pair of shakedown gloves.

About 15 minutes later, Spears came to the desk, wearing gloves, and said something to Gatson. Spears had brown writ envelopes, which were empty, and Minix's chess board in her

hand.  Spears then left with the envelopes.  He says that Spears came into the segregation area specifically to search his cell.

When he left the shower, Minix says, he asked Gatson if Spears had gone into his cell, and Gatson said yes, and that all Spears took were the envelopes.  When he went into his cell, there were about 150 grievances and other legal records scattered about on the floor.  He showed this to Gatson, who said that she would try to find him some more envelopes to put the documents in, but she never did.

Minix says that Gatson and Spears set the conspiracy in motion, in that Gatson was to call Spears as soon as Minix was taken out of his cell, so that Spears could come in and carry out a retaliatory cell search.  He says that the issue is not about the search itself, but how it was conducted and why it was carried out in such a retaliatory manner.

### X. Pamela Fannett

Minix says that after this search, Fannett was "quick to brag" and admit that she had helped Spears empty the legal envelopes onto the floor.  Fannett said that Minix was not supposed to have the envelopes, and when Minix said that "most everyone else" had them and why didn't they take anyone else's, Fannett replied that Spears "could not find anything else to take."  He says that this shows that Fannett and Spears were involved in a conspiracy to single him out and punish him for retaliatory purposes.

### XI. Lt. Davey Huddleston

Minix says that Huddleston is the senior property officer at the Powledge Unit, and that he is the official responsible for holding Minix's legal, religious, and personal property since February 10, 2006.  He says that the property is being held there because Spears refuses to provide him with storage containers.

After the use of force incident on February 10, 2006, he sent multiple requests to Huddleston saying that he needed his criminal appeal records, legal and family addresses, and a Bible.  On February 23, Huddleston provided him with one of his Bibles.  On February 28, he

received a notice that the Supreme Court had denied his application for a certificate of appealability in cause no. 05-A-223, his criminal conviction appeal.  He showed this to Huddleston and said that he needed the return of his property so that he could challenge the Court's ruling.  Huddleston replied that Minix could not do that and continued to withhold his property.  On March 1, 2006, after many more complaints, Huddleston brought Minix some addresses, but continued to withhold his legal property.

About two weeks later, on March 16, Minix says, Huddleston decided to "re-inventory" all of Minix's property.  He brought property papers for Minix to sign, and Minix asked to examine his property to be sure that everything was accounted for.  He did this because he saw that his family photographs, some 101 in all, were not listed.  Huddleston said that he would go back and look for them.

Minix told Huddleston again that he needed his criminal appeal records, including hundreds of pages of notes, as well as his law books and his pending lawsuit in Galveston. Huddleston left, and returned with Minix's appeal records, but not his notes, and said that he could not find the photographs.  Minix asked that Huddleston bring him all of his property so that he could inventory it, but Huddleston refused.  He says that Huddleston is trying to cover up the fact that Minix has missing property.  Later that day, Minix says, Huddleston sent another officer to bring him his Galveston case, but still refused to bring him his notes.

On March 22, 2006, Minix complained to Warden Hodge about how Huddleston and Spears were holding his legal property.  Hodge sent Spears and Huddleston to his cell to see what he needed.  Minix wrote out a list, but neither Huddleston nor Spears brought him any property.

A month later, on April 20, 2006, Minix was restored to Level I status, so his property restrictions were supposed to be lifted.  However, Huddleston only brought him a few miscellaneous personal property items, and did not give him any legal or religious property, nor would he allow Minix to inspect the property being withheld.

### XII. Bradley Sutton

On February 10, 2006, as stated above, Minix says that he was assaulted by Major Barbosa and Lt. Stanhope.  He says that Sgt. Sutton was present but refused to challenge what his superior officers did, nor did he report this "extraordinary behavior" to the duty warden or intervene in the incident.  Instead, he says, Sutton "just stood there."

XIII. Minix did not include a defendant no. 13, skipping from no. 12, Sutton, to no. 14, Vickie Barrow.  The pages of the complaint are numbered consecutively and there are no missing pages.

### XIV. Vickie Barrow

Minix says that Barrow is an assistant program administrator who signed grievances at the Step Two level.  He states that she has not acted to stop the ongoing violations, but has allowed the misconduct to continue.  He says that Barrow simply "rubber-stamped" some of the grievances, including giving him identical responses.

### XV. Rhoda Odom

Minix says that Rhoda Odom also has signed off on Step Two grievances, refusing to correct the abuses and condoning the multiple acts of retaliation.

### XVI. Region 2 Director Paul Pace

Minix says that on January 13, 2006, he sent a "formal complaint" to the Region 2 office, complaining of the retaliation and harassment by Spears.  Pace returned the complaint on February 9, 2006, with a cover page saying that this matter would be better handled by the unit warden, despite the fact that the complaint clearly said that the warden was condoning Spears' misconduct.  On February 27, 2006, Minix filed a grievance against Pace because of this response.

On April 7, 2006, Minix filed a second formal complaint with the Region 2 office about the harassment and retaliation, as well as the assault on February 10 and the confiscation of his property.  On April 11, Pace returned this complaint with an identical cover letter.  He says that this shows that Pace had "actual and personal knowledge" of the misconduct.

17

On May 8, 2006, Minix says that Pace signed off on a Step Two grievance which complained of ongoing retaliation by Spears, Blevins, and Hodge.  He says that this shows a pattern of retaliation by Pace.

XVII. William Snidow

Minix says that Snidow is a TDCJ chaplain.  On January 27, 2006, he wrote to Snidow asking if religious material was considered educational because Spears was refusing to provide him with additional educational storage space in which to store his religious Bible college material.  Snidow responded by saying that he could not find any mention in the policy excluding religious courses from being educational material, or being excluded from educational storage space. Minix says that with this response, Snidow acknowledged that religious college material could be educational for purposes of obtaining storage space.

On March 2, 2006, Snidow came to see Minix in response to numerous requests which Minix had filed requesting Snidow's help in obtaining the return of his property, which had been taken on February 10.  Snidow said that he had talked to Spears and that Spears had said that Minix could have storage space for the property, but that Minix was not following the rules.  Snidow did not say what rules, if any, Spears had said were not being followed.  When Minix asked Snidow for assistance in getting his property back, Snidow said that he could not get involved in what was going on and suggested that Minix obtain outside assistance.  On March 30, 2006, Minix filed a grievance against Snidow, but Odom refused to process it.  The next day, he filed another grievance, but nothing was done.

On June 12, 2006, Minix asked why Snidow would not help him get his property back.  Snidow replied that Major Barbosa and Warden Blevins had told him not to get involved. Minix complained that his right to religious freedom was being abridged, and Snidow said that he knew, but that "sometimes you gotta let them do what they want," and that he did not want to create any hostility for himself.  Snidow then "wished him good luck and went about his business."

18

## The TDCJ Records

The Court has received and reviewed copies of Minix's prison records.  As Minix says, he has filed a large number of grievances through the TDCJ grievance procedures.

On December 9, 2005, Minix filed a grievance complaining about not getting his stomach medicine.  The response was that the medication did not arrive with him, so it had to be ordered, and that it cannot be issued KOP (keep on person).  The response said that Minix was correct in saying that he missed his noon dose on two days and that the nursing staff had been made aware of this, and that it would be delivered to his cell as ordered. Minix then filed a Step Two grievance appeal, saying that on December 14, after he filed the Step One grievance, the infirmary called segregation staff and said that Minix would receive his medication only twice a day.  He says that he had been receiving the medication three times a day for two years and so the reduction in dose was retaliation by a member of the medical staff who is not named as a defendant in this lawsuit.  The response was that on December 29, 2005, after Minix had filed a sick call request, a health care provider ordered medication twice a day for seven days.  The Step Two response noted that Minix could not dictate medical treatment and that if he believed that his condition warranted evaluation, he could file a sick call request.

On December 16, 2005, Minix filed a grievance saying that he arrived at Powledge with two bags of property, and that he had requested additional storage space from Spears, but has received only excuses, and that Spears told him on December 13 that "he might not get it."  He says that Spears knows that he has been approved for extra storage space, and that he has three cases pending in the courts.  The response was that he had failed to properly complete the form, and that he had been given another form which he had not returned.

Minix filed a Step Two appeal, in which he said that he has completed the forms six times, correctly, and that Spears does not know the rules when it comes to reading the instructions on the forms.  He says that Spears should have provided him with extra storage space when he arrived and that he needs three extra storage boxes.  The response was that according to Spears,

Minix did not return the forms properly completed, and he could ask to be reconsidered fro additional storage space by submitting another request 90 days after the original request.

On December 23, 2005, Minix filed a grievance complaining that Barbosa was permitting Spears to harass him and make her own rules, and that Spears was retaliating against him by denying indigent supplies, returning his personal mail, and failing to provide him with extra storage boxes. He says that on December 16 and December 23, Spears returned outgoing personal mail and said that Minix did not send it in his indigent mail envelope; however, Spears had the envelope and would not return it. He says that if Spears holds onto his envelope, forcing him to send indigent mail in the mailbox, that's her fault. Minix insists that there is no rule requiring that indigent mail be in an indigent mail envelope before it is mailed.

Minix also says that on December 20, Major Barbosa called Minix to his office, where Spears was present as well. Barbosa had about five complaints which Minix had filed, but he "sided with Spears" on all of them, including the denial of storage space, writing on his indigent envelopes, and restricting indigent supplies. The response was that the enforcement of rules and regulations is not harassment, the issue of extra legal storage has been previously addressed, and that the allegations concerning Barbosa are without merit.

Minix then filed a Step Two grievance appeal, saying that Spears' actions are not TDCJ rules, but are "made-up rules." He says that Spears is repeatedly harassing him and that Barbosa is allowing it; he says that this is a retaliation grievance and requests that the Office of the Inspector General become involved. The response was that the issue of extra storage has been previously addressed, that Minix is receiving indigent supplies in accordance with policy, that envelopes purchased by inmates must have their name and number written on them, which is done by Spears, and that there is no evidence of harassment.

On December 29, 2005, Minix filed a Step One grievance saying that when he arrived at the Powledge Unit, he was taken before the Unit Classification Committee. At this time, Minix says, Major Barbosa said that he had spoken to Captain Smith at the Luther Unit about Minix, and

that Smith had said that Minix "could really file a lot of complaints." Barbosa then told Minix that if he started filing complaints at the Powledge Unit, he, Barbosa, would make Minix's life very difficult, that it would be in his best interest not to start filing complaints, that he should not assist an inmate there who might want help in filing complaints, and that he could approve contact visits, but that if Minix started causing problems and filing complaints, he would not do so.  Minix replied that Barbosa would not have any problems with him as long as no one bothered him, and that if he had any problems, he would bring them to Barbosa to resolve.  However, Minix says, Barbosa has refused to resolve a problem and is "letting it fester."  He notes that Barbosa called him in with Spears and said that Spears was not doing anything wrong, and that Barbosa again warned him against filing complaints.  The response was that there was no evidence to support the contention that Barbosa had been making threats against him.

Minix then filed a Step Two appeal, saying that he did not expect that Barbosa would admit to threatening him, nor for the persons present to admit it.  He says that everything which he said is true and that he wants the grievance documented as a reminder that Barbosa has threatened him.  The response was that Barbosa denies the allegations, that witnesses said that they did not hear any threats, and that there is no evidence that Barbosa threatened or harassed him.

On January 13, 2006, Minix filed a Step One grievance saying that on December 28, 2005, he talked to Warden Blevins about Spears refusing to provide him with additional storage, and Blevins said that he would talk to Spears.  On December 30, Spears retaliated against him by refusing to mail his outgoing personal mail.  After more complaints, Spears came to his cell on January 5, 2006, to inspect the legal property which he had.  Spears told him that he could not have any legal material in his "initial in-cell locker box," and Minix told her that this only applied to subsequent storage under policy ATC-01; she wanted to argue with him.  She then told him that she could only have 50 business envelopes in his initial in-cell locker box, and he again told her that this only applied to subsequent storage under the same policy.  She again wanted to argue.  Minix says

that since it was obvious that Spears did not know the rules, he told her to get out of his cell and come back when she learned the rules.

Later that day, Minix says, he was served with a disciplinary case, written by Spears, for having improperly stored legal property.  He says that it was Spears' fault that he had five stacks of legal property on the cell floor.  After the disciplinary case was thrown out as frivolous, Spears tried to get Huddleston to confiscate the property, but Huddleston said that it was her responsibility to provide storage.  Another officer also refused to do so.  The response to the grievance was that there was no evidence of retaliation or harassment, and that when Spears tried to explain the policy on envelopes, Minix refused to listen.

Minix then filed a Step Two appeal saying that Spears has been lying to Blevins, the grievance department, and other officials.  He says that he has filled out the proper forms at least six times, but that Spears has lied to the warden by saying that these forms were filled out incorrectly when they were not.  He again says that Spears does not know the rules.  The response was that Minix's participation in the review process is essential and that he must justify any questionable property being considered for verification.  On January 5, 2006, the response continued, Spears said that Minix had terminated the review process, but that he could request to be reconsidered for subsequent storage by submitting another request 90 days after the initial review.

On January 20, 2006, Minix filed a Step One grievance saying that Warden Blevins continues to allow Spears to deny him legal and educational storage space and to harass him by returning his personal mail every week.  On January 13, Spears returned his personal religious mail for the fourth time.  He says that he is entitled to be provided with five stamps per week, but that he is not being allowed to mail out five letters per week.  The response was that no wrong-doing by Spears has been found and that the issue of legal storage has been previously addressed.

Minix filed a Step Two appeal saying that Spears is retaliating against him, and the response said that there was no evidence of misconduct and that Spears reported that all indigent supply requests are processed in accordance with policy.

22

On January 30, 2006, Minix filed a Step One grievance saying that he sent in two pens to be exchanged, but Spears only sent him back one.  He says that the indigent supply request form shows that he can request two pens at a time.  When he asked Spears about it, she told him that "I'm only giving you one, but thank you for the extra pen and your hospitality.  Maybe if I restrict your pen use you won't be able to file so many grievances against me."  He says that this was done solely to harass him for filing grievances.  The response was that per policy, one pen shall be issued to an inmate, and thereafter, pens are issued on an exchange basis.  Thus, Spears' actions are within policy, and there is no evidence of harassment or retaliation.

Minix then filed a Step Two appeal, arguing that he can be issued both a "legal pen" and a "personal pen," so he can have two.  He says that the real issue is not the pen, but why Spears is harassing him.  The response was that the Step One answer had addressed his complaint.

On February 7, 2006, Minix filed a grievance complaining that he was not getting sufficient legal supplies.  The response was that this issue had been previously addressed and would receive no further response.

Minix filed a Step Two grievance saying that nothing has been done to correct the situation and that no investigation has been done.  The response was that the Step One answer addressed the issue and that he has failed to show good cause for the supplies which he requested; such supplies are issued after he shows that he has exhausted the supplies which he received and has a legitimate need for more.

On February 13, 2006, Minix filed a grievance which he denoted as a "life endangerment grievance."  He says that he has previously complained that Major Barbosa threatened him, and on February 10, 2006, Barbosa and Stanhope came to his cell and banged on the door.  Barbosa told him that he had 30 minutes to pack up his property and he's back to get it, and that anything which Minix wanted to keep should be in his locker.  Minix replied that he was not giving Barbosa his legal property, and Barbosa again said that he would be back in 30 minutes.

Barbosa returned two other times, and then came back with staff members who acted like they were running a video camera, but the camera was not on.  He told Barbosa that he had a bad heart and could not be gassed.

At 10:30 a.m., Barbosa and Stanhope returned to segregation, and Barbosa stayed outside the first door while Stanhope asked if Minix was going to come out of his cell so that they could get his legal property.  Minix said that he was not going to give them his appeal property, and Stanhope pulled out a canister of gas and sprayed him in the face.  A few minutes later, Minix came out of his cell, and Barbosa came in and pulled out all of his property out on a blanket.  For the next two days, Minix says that he suffered ongoing spontaneous chest pain and elevated heart rate.  He says that the basis for Barbosa's actions were the complaints which Minix and his family had filed.  Because of the incident, he says, he was demoted to a Level 2 restricted status and had numerous legal records confiscated.  The response was that the grievance had been included in the use of force report for further review, and that the legal records were confiscated and stored because of improper storage.

Minix filed a Step Two appeal, saying that he had filed a complaint with Region II director Paul Pace detailing the harassment and retaliation, which finally reached the point of an assault.  Minix says that all of this came about because Spears would not give him storage boxes for his property.

The response was that additional space for legal materials is authorized only if the inmate shows that the first closable storage container is totally filled with legal materials current educational materials, and a reasonable amount of other personal property items, meaning not more than one-half of the space available.  The law library supervisor will review and document need for additional storage space at least every 90 days and report concerns to the warden.  Improperly stored items may be confiscated and stored in the property room.  Inmates will be given seven days from the date of denial of additional storage, or upon completion of the grievance procedure, to make a decision regarding the disposition of excess property.

The response goes on to say that the Huntsville Access to Courts Office determined that the Step One response addressed Minix's complaint regarding his legal property. Spears said that the excess personal property was confiscated, while the excess legal property was returned to him.

On February 21, 2006, Minix filed a grievance complaining of the confiscation of his property on February 10. He says that this is the "second repeat grievance that is being filed every day" until his property is returned. The response was that the issues submitted had been addressed in three previous grievances and would receive no further response.

Minix filed a Step Two appeal asking when the issue was addressed, pointing out that he had filed multiple grievances concerning the taking of his property and asking that it be returned, with proper storage containers. The response was that an investigation showed that on January 5, 2006, Minix failed to qualify for subsequent storage in accordance with policy, and his excess property was confiscated pursuant to Administrative Directive 03.72. No further action was warranted, and the Office of the Inspector General determined that no case would be opened on Minix's use of force allegations.

Also on February 21, 2006, Minix filed a grievance appealing the disciplinary case he received from Barbosa on February 10. The response was that no procedural errors were noted, sufficient evidence was presented to support the finding of guilt, and the punishment was within established guidelines.

When Minix filed an appeal of this grievance, the response was that the disciplinary case would be overturned and Minix's records would be corrected. No explanation was given. The response also said that the Warden had the option to re-hear the case.

On February 24, 2006, Minix filed a grievance complaining that Maxwell placed his life in danger by giving authorization for chemical agents to be used on him. The response was that the assistant nurse manager (apparently Maxwell) gave authorization for the use of the gas, there were no visible injuries and no adverse health effects noted, that Minix denied any injury or

25

respiratory difficulty at the time, that Minix was examined and given an EKG, and that he has since received medication for complaints of sinus drainage.

Minix filed a Step Two appeal asking why Maxwell gave authorization for chemical agents when he, Minix, did not pose a threat, why Maxwell came to segregation personally to oversee the assault, and why Maxwell said that Minix would be fine after Minix's blood pressure was 168 / 112 and his heart rate was 147.  Minix states that Maxwell fabricated the medical records to show that no serious injury had occurred, but that he had to go to the infirmary a few hours after the incident because his heart is fluttering and skipping beats.  The response was that the Step One response adequately addressed the issues.  The response also noted that health care at the Powledge Unit is provided by UTMB Correctional Managed Health Care and that the TDCJ Health Services Division does not have the authority to override the facility provider's clinical decision; the facility providers are not employees of TDCJ and do not report to the TDCJ Health Services Director.  Furthermore, the response says that review of the grievance shows that Minix did not attempt informal resolution of his concerns with the facility medical supervisory staff and that if he believes that his condition warrants evaluation, he should file a sick call request.

On March 2, 2006, Minix filed a Step One grievance complaining that on February 28, he received notice from the Supreme Court that his criminal appeal had been denied, which required his immediate action, but he could not do so because his legal property had been confiscated.  The response was that on February 10, his property was confiscated because of improper storage, and his personal property which had current dates on it was returned; Minix had been given the opportunity to separate his legal material from his personal property to put it in his initial storage box.

Minix then filed a Step Two appeal saying that there was no "personal property" taken on February 10, but that most of it had been legal property, as well as medical records, family photos, stationery, and Bible college material.  He says that Spears deliberately kept back his criminal appeal record and civil case in Galveston, acknowledging that these records were returned

on March 16, but says that the property officer still has his "work product" in these cases.  The response was that law library records documented that Minix did not qualify for subsequent storage on January 5, 2006, in accordance with ATC-040, and so his excess property was confiscated in accordance with AD-03.72.

On March 10, 2006, Minix filed a grievance complaining that Odom, the unit grievance coordinator, was refusing to correct staff misconduct.  He says that Odom told him that Spears was wrong, but refused to do anything about it, and that she said that she was going to do what the unit officials told her to, in order to keep her job.  On another occasion, Odom brought him back a grievance because it was not an emergency, even though it was.  The response was that Odom was following policy and that his grievance had been screened and returned to him in accordance with the grievance procedures.

Minix filed a Step Two appeal complaining that unit officials have "delegated each other" to skirt policies as they see fit.  The response was that Minix had not submitted unprocessed grievances for review and that audits are conducted regularly.

On March 30, 2006, Minix filed a grievance complaining about the confiscation of his Bible college materials, as well as his legal work.  He complained that Chaplain Snidow told him that Spears had said that Minix "could" have proper storage for his property, but that Snidow refused to see to it that Minix's property was returned.  The response was that Chaplain Snidow did not have authority to make exceptions to agency policy for any inmate, and that the issue of the confiscation of his property had already been addressed.

Minix filed a Step Two appeal complaining that Snidow refused to help him.  The response was that Snidow did not have authority to make exceptions to policy for any inmate.

On April 3, 2006, Minix filed a Step One grievance saying that on March 31, Gaston, Fannett, and other unit officials came into segregation to conduct cell searches.  Minix was the second one to be pulled out of his cell, and he was put in the shower by the front desk.  Gaston picked up the phone, talked to someone briefly, and hung up.  A few minutes later, someone was let

into the segregation area and Fannett got another pair of shakedown gloves.  Some 15 minutes later, Spears came to the desk, took off her gloves, and spoke to Gaston.  She was holding empty brown writ envelopes and Minix's chessboard.  Spears then left with the envelopes.  When Minix was let out of the shower, he asked Gaston if Spears had gone in his cell, and Gaston replied that all Spears had taken were the envelopes.

`      When he went into his cell, the grievance says, Minix found about 150 grievance records and other court records scattered all over the floor.  He says that these documents had been in the envelopes taken by Spears.  Fannett told him that Spears had taken the envelopes and that he, Minix, was not supposed to have them, but stated that Spears "couldn't find anything else to take." Minix says that Spears and Gaston had obviously pre-arranged the search, calling it "retaliatory." The response to the grievance was that there was no evidence of harassment and retaliation, that Spears did take two brown envelopes which belonged to TDCJ, and that witnesses confirmed that Spears did not dump Minix's property out on the floor.

Minix filed a Step Two appeal, saying simply that the Step One grievance was sufficient to show improper behavior by Spears, Fannett, and Gaston.  The response was that there was no evidence supporting Minix's allegations.

On April 10, 2006, Minix filed a Step One grievance complaining that warden Hodge returned seven legal letters which Minix had sent to him, asking Hodge to resolve the harassment by Spears.  He says that Spears keeps returning his mail out of harassment and has denied him supplies for legal use.  Minix states that Hodge has condoned the harassment and is allowing it to continue.   The response was that Minix's allegations of harassment by staff could not be substantiated.

Minix then filed a Step Two appeal, complaining that the grievance office is refusing to resolve his complaints.  The response was that the cell search on March 31 turned up eight tablets of lined paper, over 300 sheets of paper, over 300 envelopes, 20 writ envelopes, 30 sheets of carbon paper, and nine pens, and that there was no evidence that he was being retaliated against.

28

On April 6, 2006, Minix filed a grievance complaining that the wardens had returned his legal mail, Spears had returned his legal mail, and he was not getting supplies.  He says that Spears told him that the mail had to be in an indigent envelope for her to process it, but she withholds the envelope from him.  The response was that this issue had been addressed in a prior grievance.

Minix then filed a Step Two appeal, saying that the grievance procedure was being circumvented by Odom and that this was a new instance of retaliation, so it had not been previously addressed.  The response was that the issue had been previously addressed and would receive no further reply.

On April 13, 2006, Minix filed a Step One grievance complaining that his mail was being stopped by Spears because she would not give him an indigent envelope, and he could not send out his mail without one.  He says that he has been denied all supplies since March 20, out of retaliation by Spears.  The response was that on March 31, 2006, Minix's cell was searched by Spears.  This search turned up eight tablets of lined paper, over 300 sheets of blank paper, over 300 envelopes with Minix's name written on them, 20 other envelopes, over 30 sheets of carbon paper, and nine pens with TDCJ stickers on them.  On February 9, Minix received 36 legal pads from an outside vendor, and between April 5 and 24, he sent out 23 pieces of mail.  The response also says that Minix's complaint that Spears is retaliating against him has been previously addressed.

Minix filed a Step Two appeal, asking where is the inventory done on his property on March 31.  He says that the response's listing of his property is "a pack of lies," saying that he had 3 ½ tablets of lined paper, 150 sheets of blank paper, 300 envelopes, 20 writ envelopes, and over 30 pieces of carbon paper, but none of this had been supplied by TDCJ.  He says that the nine pens were all empty and wrapped in a rubber band, and that of the 36 tablets he received, Spears has 15 of them.  Minix says that the statement that he mailed out 23 letters is a lie because Spears has been stealing his outgoing mail.  He says that Spears told him that since he has his own personal supplies,

she does not have to give him any, but this is not true.  The response was that the Step One grievance has addressed his complaint.

On April 21, 2006, Minix filed a grievance complaining that he was being denied supplies.  He says that Spears told him that he was lucky he was getting any mail out, that he was not getting supplies, and that she would "see what she could do" about his getting promoted in classification status.  The response was that this complaint had been previously addressed and would receive no further action.

Minix then filed a Step Two appeal saying that each grievance raises new factual issues of retaliation and so the present grievance has not been addressed.  The response was that the issue had been previously addressed and that his mail is being processed in accordance with policy.

On April 25, 2006, Minix filed a Step One grievance complaining that Spears is not following policy and so when he got his Level One status back, he could not get his property because Spears would not give him additional storage space.  The response was that on January 5, 2006, Spears tried to review his property for subsequent storage (i.e. additional storage containers), but that Minix did not comply with policy and would not allow her to complete the review.  He was told at that time that he did not qualify and could resubmit in 90 days, but he has not submitted an I-60 requesting additional storage space.  The retaliation issue has been previously addressed.

Minix filed a Step Two appeal saying that it was Spears, not he, who has violated policy, and that Spears has been harassing him "non-stop."  The response was that Minix failed to qualify for subsequent storage under ATC-040 and that there is no record of him resubmitting his request.

That same day. April 25, Minix filed a grievance complaining that he is being denied indigent supplies.  He says that he will refile the same grievance every day until the abuse of authority is corrected.  The response was that this complaint was previously addressed in four prior grievances and will receive no further reply.

Minix filed a Step Two appeal saying that each grievance raises new issues of ongoing retaliation and asking when this present grievance was addressed.  The response was that the issue had been previously addressed and that indigent supplies are issued in accordance with BP-03.91 and AD 07.90.

On April 26, 2006, Minix filed a Step One grievance complaining that Spears is refusing to abide by policies and procedures, including the 90-day review process set out in ATC-040.  The response was that this complaint has been previously addressed and would receive no further reply.

Minix then filed a Step Two appeal saying that his Step One grievance was not investigated because if it had been, the violations of policy would have been corrected.  The response was that he had failed to qualify for subsequent storage on January 5 and that his excess property was confiscated in accordance with AD-03.72.

<u>The Use of Force Report</u>

A use of force report was done concerning the February 10 incident.  Minix wrote a statement as part of this report.  His statement says as follows:

> On 2/10/06 from 9:30 to 10:30 a.m. Powledge Unit, Major Barbosa came to my cell, ad seg cell #10, and demanded that I give him all my legal property that was on the floor.  When I told Major Barbosa that everything was pending litigation criminal and civil and that he knows I've already been approved for additional legal storage, yet he refuses to provide it.  Lt. Stanhope was present.

> 30 minutes later Barbosa again comes to my cell "on camera" and warned me saying he would use gas on me if I didn't give him the legal property.  I still refused, telling him again that he was required per policy in AD 03.72 to provide legal storage.

> Around 10:30 a.m. Major Barbosa came with Lt. Stanhope and had Stanhope use a chemical agent on me even after I told them I was a heart patient, causing me to be subjected with a substantial risk of serious harm due to this unnecessary use of force. There was a life endangerment grievance filed against Barbosa in December 2005 for threatening me with retaliation etc. if I or my family started filing grievances or complaints on the Powledge Unit, and the reason for Barbosa's actions by using chemical agents on me is strictly out of retaliation.  My family filed complaints in January and February 2006 against Barbosa with ombudsman, OIG, and senator for denying me proper storage, and now he's carrying out his threat.

The report also contains statements from officers involved and reflects that Minix was seen by a nurse named Angie Warren, who determined that he had not been injured.

   The Court has received and reviewed a copy of the video tape of the use of force incident.  The tape opens with Lt. Stanhope introducing the members of the use of force team.  They go to the segregation area and identify Minix.  Stanhope says that Minix has been ordered to store his property in his locker box and all excess property will be confiscated.  Minix repeatedly says that the property is his criminal appeal.  Stanhope says that Minix has been ordered to submit to a strip search and exit his cell.  Minix says that he is not refusing anything, but that he is refusing to give up his property because he has not been provided with proper storage.

   Lt. Stanhope puts on a gas mask.  Minix says that there are people in the segregation area with asthma and that he is a heart patient.  He says that he has been there for two months and has not been given proper storage space.  Stanhope shoots a burst of gas into the cell.  Another inmate is heard talking about the situation at that time.  Minix comes to the door of the cell complaining about his chest.  Stanhope asks if he is coming out and Minix says yes.  Stanhope tells him to strip and Minix appears to indicate that he cannot, but then does.  Stanhope says that he will be taken to the shower.  Minix tosses his clothes out of the cell door.  He is then handcuffed through the slot in the door and is brought out of the cell.

   Minix is taken down the hall and placed in the shower.  He again complains that his chest hurts.  Stanhope tells him that a use of force report is being done and that he can make a statement.  Nurse Warren comes to the shower and asks him a few questions, including whether or not he is injured.  Minix made no complaints to her, and so she tells Stanhope that "it's clear" and leaves.  Minix is taken out of the shower and placed in #9 cell.  The use of force video is then terminated.

Minix's Medical Records

The medical records show that on February 10, 2006, at about 3:15 p.m., Minix was seen in the infirmary for a complaint of chest pain. An EKG exam showed sinus tachycardia but was otherwise normal.[1] His blood pressure was 135/80, but his pulse was 106.

On February 14, 2006, Minix filed a sick call request asking that a medication called Dexbrom, an antihistamine and decongestant, be renewed. The next day, he wrote a sick call request asking for a new bottle of nitroglycerin. He says that the gas caused a lot of chest pain which has required more use. The response was that he was given a KOP (keep on person) pack on February 16, and that he should not take nitro for gas.

On February 17, Minix saw nursing staff complaining of allergy problems. On March 3, he wrote a sick call request saying that he was having problems with periodic ongoing twitches in his left eye and the back of his head hurting. He says that this started on February 10 when the chemical agents were used on him. He also says that his chest pain is more frequent and that he is having to take more nitroglycerin than usual. The response was that he had a scheduled sick call and he should discuss his concerns at that time.

On March 4, Minix saw the nurse for complaints regarding his allergies. On March 8, he was seen for his complaint of eye twitching; no twitching was noted, and the exam of his eyes proved normal. On March 27, he asked the nurse for a renewal of nitroglycerin.

Legal Standards and Analysis

I. Warden Blevins

Minix says that Blevins failed to investigate his complaints, "signed off" on the use of chemical agents, and ignored Supreme Court documents which Minix sent to him. Prisoners have

---

[1]Sinus tachycardia is a sinus rhythm with a rate of over 100 beats per minute. It is normally a physiological response to an external cause, such as fever, intravascular volume depletion, hypermetabolism, or the administration of pharmacologic agents which dramatically increase sinus rate, such as catecholamines. It is not a condition which is treated *per se*; rather, the cause of the sinus tachycardia should be treated. *See* http://www.americanheart.org/presenter.jhtml? identifier=55 .

no constitutional right to have their complaints investigated in the manner which they deem appropriate.  *See* Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005).  The claim regarding "signing off" on the use of chemical agents is in essence a claim of liability under the doctrine of *respondeat superior*.  The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases.  Williams v. Luna, 909 F.2d 121 (5th Cir. 1990).  A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation.  Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).

In this case, Minix has not shown that Blevins was personally involved in a constitutional deprivation; he does not contend that Blevins was present when the chemical agents were applied, and, as will be explained below, Minix has not shown that the use of the chemical agents was itself a constitutional violation.  Nor has he shown a causal connection between wrongful conduct by Blevins and a constitutional violation, or that Blevins implemented a constitutionally deficient policy which was the moving force behind a constitutional deprivation.  Minix's claims against Blevins are without merit.

II. Warden Hodge

Minix's claim against Hodge is that the warden did not investigate his complaints as Minix thought that he should, and that Hodge did not take the corrective action which Minix believed most appropriate.  As noted above, Minix does not have a constitutional right to have his grievances resolved to his satisfaction.  Geiger, 404 F.3d at 373-74.  Minix's claims against Warden Hodge are without merit.

III. Major Barbosa

Minix brings four complaints against Barbosa.  These are for threatening him, for using chemical agents against him, for retaliating against him, and for being involved in conspiracies against him.

The Fifth Circuit has held that verbal threats are not constitutional violations.  Bender v. Brumley, 1 F.3d 271, 274 n.3 (5th Cir. 1993); McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983).  While Barbosa's threats may have been intemperate, they do not rise to the level of a Section 1983 violation.

The tape of the February 10 incident and Minix's own statements show that on that date, prison officials came to his cell to confiscate his excess property.  Minix was given direct orders to exit his cell but refused, saying that he would not turn over his legal materials because they represented his criminal appeal.

The Supreme Court, in Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995 (1992), held that inmates raising allegations of excessive force must show that the force used was malicious and sadistic for the very purpose of causing harm rather than in a good faith effort to restore discipline; the Court also noted that the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind."  Hudson, 112 S.CT. AT 999.

In accordance with this decision, the Fifth Circuit has identified five factors which should be considered in determining whether an unnecessary and wanton infliction of pain was done in violation of an inmate's right to be free from cruel and unusual punishment.  These factors are: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response.  Baldwin v. Stalder, 137 F.3d 836, 839 (5th Cir. 1998); Hudson v. McMillian, 962 F.2d 522, 523 (5th Cir.

1992).  It should be noted that not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.  <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied sub nom.* <u>John v. Johnson</u>, 414 U.S. 1033 (1973) (cited with approval in <u>Hudson</u>, 112 S.CT. AT 1000).

In reviewing the first factor, the Court looks to the recent case of <u>Brown v. Lippard</u>, 472 F.3d 384 (5th Cir. 2006).  In that case, inmate Marcus Brown had a verbal dispute with officer Fred Lippard, and Brown sat down to await the arrival of a superior officer.  Lippard struck him several times and tried to ratchet his arms, which were handcuffed behind him, over the inmate's head.  Brown went to a physician and complained of knee, hand, and shoulder pain, and the nurse found one-centimeter abrasions on his left knee and left shoulder, pain in his right knee, and tenderness around his left thumb.

Lippard filed a motion for summary judgment alleging that Brown's injuries were *de minimis*.  This motion was supported by an affidavit from Dr. Glenda Adams saying that Brown's injuries were minor, noting that there were no fractures, sprains, lacerations, or bleeding.  The district court denied the motion for summary judgment, and Lippard appealed.

On appeal, Lippard argued that Brown's injuries were not severe enough to support an excessive force claim.  The Fifth Circuit stated that the Court had never directly held that injuries must reach beyond some arbitrary threshold to satisfy an excessive force claim.  Instead, the Court said, in evaluating use of force claims, the courts may look to the seriousness of the injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.  <u>Brown</u>, 472 F.3d at 387, *citing* <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986).  The Fifth Circuit went on to state that injuries are insufficient to support an excessive force claim where there is *no* physical injury, or where the injury is extremely minor, such as a bruise caused by having one's ear twisted, but that the attack and injuries described by Brown "cannot be likened to a twisted ear."

36

Instead, the Court said, the injuries in <u>Brown</u> were more akin to those in <u>Gomez v. Chandler</u>, 163 F.3d 921 (5th Cir. 1999), in which the inmate was knocked down and punched repeatedly, and suffered "cuts, scrapes, and contusions to the face, head, and body." The Court noted that not only were Brown's injuries more akin to those in <u>Gomez</u>, but the alleged force used was not applied in a good-faith effort to maintain or restore discipline, but was malicious and sadistically done for the very purpose of causing harm.

The Fifth Circuit noted that Lippard tried to minimize Brown's injuries as requiring nothing more than "swabbing with Betadine," but stated that the Supreme Court has "put to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks." <u>Brown</u>, 472 F.3d at 387, *citing* <u>Hudson</u>, 503 U.S. at 13 (Blackmun, J., concurring). The Fifth Circuit stated that while the injuries to Brown did require medical care, Lippard "apparently prefers a pre-<u>Hudson</u> standard requiring the complainant to receive *serious* medical attention. There is no basis for that position." <u>Brown</u>, 472 F.3d at 387. The Fifth Circuit therefore upheld the district court's denial of summary judgment to the defendant.

The present case differs from <u>Brown</u> in one crucial detail - in that case, the use of force was entirely unwarranted, while in the present case, the use of force was brought about by the fact that Minix refused to comply with orders to leave his cell and turn over his excess property. While Minix may believe that these orders were unjustified and improper, this does not give him the right to disobey them at his whim. *See, e.g.*, <u>Meadows v. Gibson</u>, 855 F.Supp. 223, 225 (W.D. Tenn. 1994) (prisoners cannot pick and choose which prison rules to obey).

In this case, an examination of Minix immediately after the incident revealed no injuries and he made no complaint to the nurse at the time, but showed up in the infirmary a few hours later complaining of chest pains and apparently suffering from an elevated heart rate. The first <u>Hudson</u> factor is not conclusive but tends to weigh in Minix's favor.

The second Hudson factor concerns the need for the application of force.  As stated above, Minix was refusing to comply with orders, plainly an impermissible activity in a prison setting.  Although he argues that he posed no threat because he was locked inside of his cell, this is not dispositive; the Fifth Circuit has held that the use of tear gas, when reasonably necessary to prevent riots or escapes or to subdue recalcitrant prisoners, does not constitute cruel and inhuman punishment.  Clemmons v. Greggs, 509 F.2d 1338, 1340 (5th Cir. 1975) (citing Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966).  This position has been taken by other circuits as well.  Bailey v. Turner, 736 F.2d 963, 969 (4th Cir. 1984) (use of Mace on an unruly or recalcitrant inmate who was confined in his cell did not violate the Constitution); Soto v. Dickey, 744 F.2d 1260, 1270 (7th Cir. 1984) (use of chemical agent when inmate refused to obey a direct order did not violate the Constitution).

As in Bailey, Minix was confined to his cell; as in Clemmons and Soto, he was refusing direct orders.  It was his refusal to comply with orders which led to the application of the chemical agents.  The second Hudson factor weighs strongly against Minix.

The third Hudson factor concerns the relationship between the need and the amount of force used.  The need for the use of force was created by Minix's recalcitrance, and the courts have stated that the amount of force used (i.e. the application of chemical agents) is not excessive to such a need, even when the prisoner is confined in his cell.  The third Hudson factor weighs against Minix.

The fourth Hudson factor concerns the threat perceived by the prison officials.  While Minix did not pose a physical threat per se, the fact of his disobeying orders itself poses a threat to the order and security of the prison as an institution.  See, e.g., Soto, 744 F.2d at 1270-71.  The fourth Hudson factor weighs against Minix.

The fifth Hudson factor concerns efforts made to temper the severity of a forceful response.  Minix acknowledges in his complaint that Barbosa and Stanhope came to his cell several times before administering the gas, and the video shows that he was given an opportunity to comply

38

with the orders before the gas was used.  Had Minix elected to comply with the orders, the force would not have been necessary.  The fifth Hudson factor weighs against Minix.

In addition, Minix has not shown that the gas was used maliciously or sadistically for the very purpose of causing harm, rather than in a good faith effort to restore the discipline breached by his refusal to comply with orders.  Minix does not have the right to refuse to comply with orders and then claim that actions taken in response to his refusal were maliciously done.  *Cf.* Orebaugh v. Caspari, 910 F.2d 526, 528 (8th Cir. 1990) (prisoners cannot flout prison regulations after filing a grievance and then claim that adverse actions were done in retaliation rather than in response to the breach of regulations).  His claim that Major Barbosa unconstitutionally used excessive force upon him is without merit.[2]

Similarly, Minix complains that Major Barbosa acted in retaliation against him in the use of the chemical agents.  The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred. Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997).  This requirement places a heavy burden upon inmates, because mere conclusionary allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred.  Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation.  Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

---

[2]Although Minix also claims that the use of the gas was excessive because he has a heart condition, he concedes that Nurse Kelly Maxwell gave authorization for the gas to be used.  Major Barbosa was entitled to rely on this authorization by medical staff, rather than Minix's statement that he had a heart condition.

Minix's claim of retaliation by Barbosa fails because he has failed to meet the element of causation.  In other words, he has not shown that but for the complaints and grievances which he filed, the adverse action - i.e., the use of chemical agents - would not have occurred.

The Fifth Circuit has cautioned as follows:

> The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties.  Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.

Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  The Court went on to explain that district courts must "carefully scrutinize" claims of retaliation in order to ensure that prisoners do not "inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around themselves."  Woods, 60 F.3d at 1166; accord, Orebaugh v. Caspari, 910 F.2d at 528 (noting that "while a prisoner can state a claim of retaliation by alleging that disciplinary actions were based upon false allegations, no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform.")  As the Eighth Circuit explained, any other rule would allow a prisoner to openly flout prison regulations after filing a grievance and then bring a claim under Section 1983 arguing that prison officials disciplined him in retaliation for filing a grievance.  Orebaugh, 910 F.3d at 528.

Similarly, Minix cannot refuse to comply with orders and then contend that the consequences of his refusal were motivated by retaliation, rather than the refusal itself.  He has offered nothing more than his personal belief that the adverse action was motivated by retaliation rather than his own behavior.  Nor has Minix shown that Barbosa acted in retaliation against him, as defined by the Fifth Circuit, in any other regard.  His retaliation claim against Major Barbosa is without merit.

Finally, Minix contends that Major Barbosa is involved in "conspiracies" against him.  The Fifth Circuit has stated that specific facts must be pled when a conspiracy is alleged; mere conclusory allegations will not suffice.  Hale v. Harney, 786 F.2d 688, 690 (5th Cir. 1986).  In

40

pleading these specific facts, the Plaintiff must allege the operative facts of the alleged conspiracy. Lynch v. Cannatella, 810 F.2d 1363, 1369-70 (5th Cir. 1987).

In addition, to recover on a claim of a conspiracy, the Fifth Circuit has held that there must be an actual deprivation of a constitutional right; a mere conspiracy to deprive is insufficient. Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir. 1984). In this case, Minix has failed to offer specific facts in support of his claim of a conspiracy, and he alleges a mere conspiracy to deprive on the part of Major Barbosa. Nor has he shown the operative facts of any such conspiracy outside of his own speculation. Minix's claims against Major Barbosa are without merit.

## IV. Lee Ann Spears

Minix indicates that Spears is the most culpable person in his claim. He asserts that Spears refused to give him legal storage space although he showed his need for it (thereby interfering with his right of access to court), that she denied him legal supplies in retaliation for his filing of complaints, and that she refused to send his outgoing mail. These claims, if proven, show potential constitutional violations. Minix's claims against Spears should be allowed to proceed. Although Minix contends that Spears "trashed his cell," scattering his legal materials on the floor, he does not assert that he lost anything other than some envelopes as a result of this search, or that his right of access to court was thereby denied or infringed upon. This claim against Spears is without merit.

## V. Ronnie Stanhope

Minix's first claim against Stanhope concerns the use of chemical agents on February 10. As with Major Barbosa, these claims are without merit. Minix's contention that Stanhope laughed about applying "most of the gas" in the canister is not reflected on the tape of the incident.

Second, Minix complains that Stanhope did not properly investigate a complaint which he made against Barbosa. As noted above, prisoners have no constitutional right to have their complaints investigated in the manner which they deem appropriate. Geiger v. Jowers, 404 F.3d at 373-74. This claim is without merit.

41

Third, Minix complains that after his disciplinary case was overturned, it was re-written by Stanhope, placing himself as charging officer rather than Barbosa.  In order to proceed on a claim regarding the disciplinary case which he received from Stanhope, Minix must show that the case has been overturned, expunged, or otherwise is no longer valid.  *See* Edwards v. Balisok, 520 U.S. 641, 646-48 (1997); Clarke v. Stalder, 154 F.3d 186, 189 (5th Cir. 1998).  Furthermore, the courts have held that prison inmates have no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.  Freeman v. Rideout, 808 F.2d 949, 951 (2nd Cir. 1986).  The mere filing of false charges does not amount to a constitutional violation because the deprivation of a liberty interest is effected by the finding of guilty, not by the mere filing of the false charges, and the inmate was given an opportunity, in accordance with the due process structures of Wolff, to rebut the charges at the disciplinary hearing.  Freeman, 808 F.2d at 952-53.

In Hanrahan v. Lane, 747 F.2d 1137, 1140-41 (7th Cir. 1984), the Seventh Circuit explained that the allegation that a prison guard planted false evidence that implicates an inmate in a disciplinary infraction fails to state a claim where the procedural protections as required in Wolff v. McDonnell are provided.  Hanrahan, 747 F.2d at 1141.  The Court stated that although prisoners are entitled to be free from arbitrary action and conduct of prison officials, the protections against such arbitrary action are the procedural due process requirements set forth in Wolff.  Hanrahan, 747 F.2d 1140.  Were this rule not in effect, inmates could evade the bar on factual reviews of prison disciplinary cases by federal courts simply by alleging that the evidence used to support the disciplinary case is false.  *See* Smith v. Rabelais, 659 F.2d 539 (5th Cir. 1981) (*de novo* factual reviews of challenges to disciplinary cases are not required).

Thus, Minix's claim that Stanhope wrote a false disciplinary case, without more, does not itself set out a constitutional violation, even apart from the fact that his claim on this point is premature because he has not shown that the case written by Stanhope has been overturned or set aside.  This claim is without merit.

Finally, Minix complains that Stanhope conspired with Barbosa with regard to the use of chemical agents. The video tape shows that the team met before going to Minix's cell, which comports with Minix's assertion that Stanhope and Barbosa met together prior to the use of force, but this does not show any conspiracy in violation of Minix's constitutional rights. The Fifth Circuit has held that to recover on a claim of a conspiracy, there must be an actual deprivation of a constitutional right; a mere conspiracy to deprive is insufficient. Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir. 1984). Minix has failed to show such a deprivation in the fact that Stanhope met with Barbosa prior to the use of chemical agents. His claims against Stanhope are without merit.

VI. Captain Atwood

Minix says first that Captain Atwood knew that the disciplinary case against him was filed in retaliation, but found him guilty anyway. He fails to explain how Atwood "knew" that the case was given in retaliation, rather than for a perceived violation of prison rules. In addition, Minix has not shown that he was deprived of a constitutionally protected liberty interest as a result of the finding of guilt by Atwood. *See* Sandin v. Conner. 115 S.Ct. 2293, 2300 (1995). This claim is without merit.

Second, Minix complains that Atwood did not properly investigate his allegations that Barbosa was placing him in danger. This complaint is without merit. Geiger, 404 F.3d at 373-74.

Third, Minix complains of a March 22 meeting at which he complained of Spears' actions, which were "clearly condoned" by Atwood, who refused to interfere with Spears' activities. Atwood had no duty to believe Minix rather than Spears, nor to order Spears to conform with Minix's view of what the regulations required. This claim is without merit.

Fourth, Minix says that on May 5, 2006, he told Atwood that Spears was refusing to issue him writing supplies, thus forcing Minix to obtain these supplies from other inmates, or to write letters on grievance forms or the backs of legal forms; he says that Atwood said that he would talk to Spears about it, but did nothing. However, Minix fails to show that Atwood did not in fact talk to Spears about the incident, as he had promised. Minix also complained to Atwood about

43

Spears trashing his cell, and Atwood said that he knew about that incident and that Spears "had given some reason for it." Once again, Minix has not shown that Atwood had any duty to believe him over Spears. This contention is without merit.

Fifth, Minix says that on May 11, 2006, Atwood presided over another disciplinary case, which was the re-hearing of the February 15 case originally written by Barbosa,  The later case had been written by Stanhope. Atwood found him guilty again and gave him the same punishment, even though Stanhope testified that he had conspired with Barbosa to use the chemical agents. Minix has not shown that this case has been overturned or expunged, and so his claim regarding it is premature. His claims against Atwood are without merit.

### VII. Kelly Maxwell

Minix says first that the second day that he arrived at the Powledge Unit, the medical staff began refusing to bring him his stomach medication three times a day, which he had been on for over two years. On December 9, he filed a grievance complaining about this. On December 14, the medical department retaliated against him by reducing the dosage to twice a day. On January 6, the grievance was returned, saying that Minix would get his medication three times a day, but it remained at only twice a day. Minix says that this proves that "someone in the medical department" over-rode the grievance decision and retaliated against him for filing it; however, he does not show that Maxwell was involved in this. On January 9, 2006, Minix says, his family filed a complaint against the medical department for retaliating against him. The prison health services in Huntsville took no action to resolve the issue. Minix does not say how Maxwell was involved in this claim.

The Fifth Circuit has stated that in order to successfully plead a cause of action in civil rights cases, a plaintiff must enunciate a set of facts that illustrate the defendants' participation in the alleged wrong. Jacquez v. Procunier, 801 F.2d 789, 793 (5th Cir. 1986). Minix has failed to do so with respect to Maxwell in this claim. Furthermore, the medical records show that a physician changed his prescription from three times a day to twice a day. Minix's disagreement with the medical doctor's decision does not amount to a constitutional violation. Norton v. Dimazana, 122

44

F.3d 286, 293 (5th Cir. 1997).  This claim is without merit.  Similarly, the fact that Maxwell did not respond to Minix's grievances in the way that Minix believed appropriate does not set out a constitutional violation.  Geiger, 404 F.3d at 373-74.

The Fifth Circuit has held that while deliberate indifference to serious medical needs is an extremely high standard to meet, conduct that would clearly evince a wanton disregard for any serious medical needs will suffice.  Domino v. TDCJ-ID, 239 F.3d 752, 756 (5th Cir. 2001). Minix's assertions that Maxwell gave approval for the use of chemical agents despite knowing that Minix was a heart patient, and that Maxwell falsified his medical records to show that he had not suffered any injury from the chemical agents, could, if proven, show potential constitutional violations.  Minix shall be allowed to proceed on this case.

VIII. Charlotte Odom

Minix complains that Charlotte Odom, the grievance coordinator at the Powledge Unit, had "the authority, duty, and obligation to correct, report, and enforce prison policies," but failed to take action on his grievances.  As noted above, the Fifth Circuit has stated that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so.  Geiger v. Jowers, 404 F.3d at 373-74; see also Edmond v. Martin, et al., slip op. no. 95-60666 (5th Cir., Oct. 2, 1996) (unpublished) (holding that a prisoner's claim that a defendant "failed to investigate and denied his grievance" raises no constitutional issue) and Thomas v. Lensing, et al., slip op. no. 01-30658 (5th Cir., Dec. 11, 2001) (unpublished) (same).  Minix's claims against Odom are without merit.

IX. Alynda Gatson

Minix says that prior to the search of his cell by Spears on March 31, 2006, Gatson apparently called Spears on the phone and told her that Minix had been removed from his cell. Spears then came to the segregation area and conducted the search of his cell.  Although Minix says that this was "evidence of a conspiracy," he has failed to show any constitutional violation in the fact

45

that Gaston called Spears to tell her that Minix had been removed from his cell.  As discussed above, Minix has not shown any constitutional violation which occurred as a result of the search of his cell on this date.  His claim against Gaston is without merit.

### X. Pamela Fannett

Similarly, Minix complains that after the search, Officer Fannett said that she had helped to empty Minix's envelopes onto the floor, and that according to Fannett, Minix was not supposed to have the envelopes, but that other inmates had them too.

Minix's own grievances show that he had a considerable amount of property in his cell.  He states in a Step Two grievance that he had 3 ½ tablets of lined paper, 150 sheets of blank paper, 300 envelopes, 20 writ envelopes, and over 30 pieces of carbon paper.  Minix has not shown a constitutional violation in the fact that the writ envelopes, which prison records show were TDCJ property, were taken away; he has not shown that he was thereby denied access to court.  *See* Mann v. Smith, 796 F.2d 79, 83 (5th Cir. 1986) (right of access to legal materials is simply an offshoot of the right of access to court, because the Court's main concern is protecting the ability of the inmate to prepare a petition or complaint).  The fact that other inmates also had envelopes of this type does not mean that Minix thereby had a right to possess them.  Minix's claim against Fannett is without merit.

### XI. Lt. Davey Huddleston

Minix says that Huddleston is the senior property officer at the Powledge Unit, and that he is the official responsible for holding Minix's legal, religious, and personal property since February 10, 2006.  He says that the property is being held there because Spears refuses to provide him with storage containers.

The Fifth Circuit has upheld TDCJ-CID's limitations on the storage space available to prisoners.  Long v. Collins, 917 F.3d 3, 4 (5th Cir. 1990); Duplantis v. Carmona, 85 Fed.Appx. 397 (5th Cir., Jan. 16, 2004) (not selected for publication in the Federal Reporter).  In Simmonds v. Cockrell, 81 Fed.Appx. 488 (5th Cir., Nov. 24, 2003) (not selected for publication in the Federal

Reporter), the plaintiff Gordon Simmonds complained that TDCJ storage regulations violated his constitutional rights because he did not have sufficient storage space for all of his property and property not adequately stored would be subject to confiscation, and that the regulation violated his right of access to courts by limiting the amount of legal materials he could possess in his cell. Simmonds conceded that the regulations were adopted to prevent fire and other safety hazards.  The district court dismissed the lawsuit as frivolous, and the Fifth Circuit affirmed this dismissal.

In the present case, Minix asserts that Spears did not give him additional storage space.   Given this lack of additional storage space, Minix has failed to show that Huddleston violated his constitutional rights by not giving him back his property, for which he lacked storage. Minix does not have a right to keep his property on the floor or scattered about his cell.  As Minix says, the root of his problem was the fact that Spears did not give him adequate storage space, not that Huddleston did not return property which he had no place to store.  Minix's claim against Huddleston is without merit.

To the extent that Minix complains of the loss of family pictures, this claim also lacks merit as a federal cause of action.   The doctrine of Parratt v. Taylor, 451 U.S. 527 (1981) (overruled in part on grounds not relevant here) and Hudson v. Palmer, 468 U.S. 517 (1984), known collectively as the *Parratt/Hudson Doctrine*, states that a random and unauthorized deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy.  *See* Caine v. Hardy, 943 F.2d 1406, 1412 (5th Cir. 1991).  Three predeprivation conditions must exist before the doctrine can be applied.  These are: (1) that the deprivation be unpredictable; (2) that predeprivation process be impossible, making any additional safeguard useless; and (3) that the conduct of the state actor be unauthorized.  Where these conditions exist, the State cannot be required to do the impossible by providing predeprivation process.  Charbonnet v. Lee, 951 F.2d 638, 642 (5th Cir. 1992), *citing* Zinermon v. Burch, 494 U.S. 113 (1990); Myers v. Klevenhagen, 97 F.3d 91, 94-95 (5th Cir. 1996).

Hudson holds that deprivations of property by prison officials, even when intentional, do not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists. Hudson, 468 U.S. at 533. The Texas state administrative and judicial systems provide an adequate state post-deprivation remedy. Tex. Gov. Code Ann. art. 501.007 (Vernon Supp. 1994); see also Murphy v. Collins, 26 F.3d 541, 543-44 (5th Cir. 1994). Thus, the appropriate forum for the plaintiff's claim regarding the loss of his family pictures lies in state court or in the administrative procedures of TDCJ rather than federal court. Simmons v. Poppell, 837 F.2d 1243 (5th Cir. 1987).

XII. Bradley Sutton

On February 10, 2006, as stated above, Minix says that he was assaulted by Major Barbosa and Lt. Stanhope. He says that Sgt. Sutton was present but refused to challenge what his superior officers did, nor did he report this "extraordinary behavior" to the duty warden or intervene in the incident. Instead, he says, Sutton "just stood there."

The Fifth Circuit has held that a supervisory officer may be held liable under Section 1983 if he refuses to intervene when subordinates are beating an inmate in his presence. Harris v. Chanclor, 537 F.2d 203, 205 (1976). In this case, however, Minix's pleadings show that the opposite situation exists. Minix contends in effect that Sgt. Sutton, a lower ranking officer, had a duty to step in and order his supervisors, Major Barbosa and Lt. Stanhope, to cease their actions.

Even if subordinate officers have a legal duty to intercede in such cases and stop their superiors from taking action, a dubious proposition at best, such duty would necessarily extend only to unlawful uses of force. O'Neill v. Krzeminski, 839 F.2d 9, 11 (2nd Cir. 1988). Here, Minix offers nothing to show that Sutton necessarily knew that the action was "illegal;" Minix's own pleadings show that he had far more property in his cell than he had room to store it, and that Nurse Kelly Maxwell approved the use of chemical agents upon Minix. Whether or not Barbosa and Stanhope knew that what they were doing was improper, Minix offers nothing to show that Sutton would have

48

known, nor that Sutton could have prevented the actions of his superior officers even had he wanted to.  Minix's claim against Sutton is without merit.

XIII. Minix did not include a defendant no. 13, skipping from no. 12, Sutton, to no. 14, Vickie Barrow.  The pages of the complaint are numbered consecutively and there are no missing pages.

XIV. Vickie Barrow

Minix says that Barrow signed grievances at the Step Two level, and did not act to stop the "ongoing violations," but has allowed the misconduct to continue.  He says that Barrow simply "rubber-stamped" some of the grievances, including giving him identical responses.

However, Minix does not have a constitutional right to have his grievances resolved to his satisfaction, nor to have Barrow investigate his complaints in the way which he deems most appropriate.  Geiger, 404 F.3d at 373-74.  His claim against Barrow is without merit.

XV. Rhoda Odom

Similarly, Minix says that Rhoda Odom also has signed off on Step Two grievances, which he says amounts to "refusing to correct the abuses and condoning the multiple acts of retaliation."  As with his claims against Barrow, Minix does not have a constitutional right to have his grievances resolved in his favor or to have them investigated in the way which he deems proper.  Minix's claims against Odom are without merit.

XVI. Region 2 Director Paul Pace

Minix says that he sent a "formal complaint" to the Region 2 office, complaining of the retaliation and harassment by Spears, but that Pace returned the complaint with a cover page saying that this matter would be better handled by the unit warden, even though Minix's complaint clearly said that the warden was condoning Spears' misconduct.

Later, Minix says, he filed a second "formal complaint" with the Region 2 office about the harassment and retaliation, as well as the assault on February 10 and the confiscation of his property.  Pace returned this second complaint with an identical cover letter.  He says that this

shows that Pace had "actual and personal knowledge" of the misconduct. Additionally, Minix says, Pace signed off on a Step Two grievance complaining of ongoing retaliation, and says that this shows a "pattern of retaliation" by Pace.

Minix does not have a constitutional right to have Pace investigate his grievances in the way that he thinks proper, or to respond to his complaints in a manner which Minix considers appropriate. The fact that Pace referred Minix to the unit warden does not show a constitutional violation, because Minix does not have the right to choose which officials may investigate his complaints. The fact that Pace signed a grievance which was not to Minix's liking does not show a constitutional violation. Geiger, 404 F.3d at 373-74. Minix's complaint against Pace is without merit.

### XVII. William Snidow

The final Defendant named by Minix is William Snidow, a TDCJ-CID chaplain. He says that Snidow told him that he, the chaplain, he could not find any mention in the policy excluding religious courses from being educational material, or being excluded from educational storage space; according to Minix, Snidow thereby acknowledged that religious college material could be educational for purposes of obtaining storage space.

On March 2, 2006, Minix says, Snidow came to see him in response to numerous requests which Minix had filed requesting Snidow's help in obtaining the return of his property, which had been taken on February 10. Snidow said that he had talked to Spears and that Spears had said that Minix could have storage space for the property, but that Minix was not following the rules. Snidow did not say what rules, if any, Spears had said were not being followed. When Minix asked Snidow for assistance in getting his property back, Snidow said that he could not get involved in what was going on and suggested that Minix obtain outside assistance. Minix filed grievances against Snidow, but nothing was done. Later, Minix says, Snidow told him that Barbosa and Blevins had told him not to get involved, and that he, Snidow, did not want to create any hostility for himself. Minix says that Snidow "then wished him good luck and went about his business."

The response to Minix's grievances state that Snidow did not have authority to exceptions to TDCJ policy, and Minix has not shown that this was incorrect.  In addition, Minix has not shown that Snidow had a constitutional duty to intervene and help him get his property back, or that the chaplain's failure to do so violated a right secured by the Constitution or laws of the United States.  Consequently, his claim against Snidow is without merit.  *See* Johnson v. Dallas Independent School District, 38 F.3d 198, 199 (5th Cir. 1994) (one element of a Section 1983 claim is the showing of the deprivation of a right secured by the Constitution or laws of the United States).

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory.  Neitzke v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Minix's complaints against all of the Defendants except for Lee Ann Spears and Kelly Maxwell lack any arguable basis in law and fail to state a claim upon which relief may be granted.  Consequently, these claims may be dismissed as frivolous under 28 U.S.C. §1915A(b).  *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

51

ORDERED that the Plaintiff's claims against the Defendants Dennis Blevins, Weldon Hodge, Joel Barbosa, Ronnie Stanhope, Delton Atwood, Charlotte Odom, Alynda Gatson, Pamela Fannett, Davey Huddleston, Bradley Sutton, Vickie Barrow, Rhoda Odom, Paul Pace, and William Snidow are hereby DISMISSED with prejudice as frivolous.  It is further

ORDERED that the Defendants Dennis Blevins, Weldon Hodge, Joel Barbosa, Ronnie Stanhope, Delton Atwood, Charlotte Odom, Alynda Gatson, Pamela Fannett, Davey Huddleston, Bradley Sutton, Vickie Barrow, Rhoda Odom, Paul Pace, and William Snidow are hereby DISMISSED as parties to this lawsuit.  The dismissal of these claims and parties shall have no effect upon the Plaintiff's claims against the Defendants Lee Ann Spears and Kelly Maxwell.  Finally, it is

ORDERED that the dismissal of these claims and parties shall not count as a strike for purposes of 28 U.S.C. §1915(g).


**So ORDERED and SIGNED this 23rd day of April, 2007.**


JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

52